UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,              CRIMINAL NO. 13-cr-20001-01

v.                                  HON. BERNARD A. FRIEDMAN

WALANDO KENNEY,

               Defendant.

_____/

### United States' Response Opposing
### the Defendant's Motion for Compassionate Release [36]

Walando Kenney is a career criminal, with thirteen (13) felony convictions that span over 30 years of his adult life. He has been convicted of various crimes including carrying a concealed weapon, receiving and concealing stolen property and escape from prison. *Presentence Investigation Report [PSR],* 7-14. This Court convicted Kenney of possession with intent to distribute over 100 grams of heroin, when officers found 4,256 individual packets of heroin in Kenney's car. He was arrested one year and six days after his last release from parole. The Court initially sentenced Kenney to 92 months incarceration followed by 4 years supervised release. ECF No. 24, Judgement, 72-75. His sentenced was reduced to 77 months incarceration because of a retroactive guideline reduction. ECF No. 31, Order Regarding Motion for Sentence Reduction, 86.

1

Kenney had to serve time for an intervening state felony conviction, and therefore began serving his current federal sentence on July 17, 2017. *Gov't Sealed Exhibit A: BOP Public Information,* 3. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Kenney does not qualify for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Although Kenney's heightened risk from Covid-19 based on his obesity qualifies as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Kenney is not otherwise eligible for release. Kenney's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2), because he has a long history of criminal activity, conviction and re-offending—so much so, that even though Kenney is 56 years old, the Bureau of Prisons [BOP] continues to assess him at a "high risk recidivism level." *Gov't Sealed Exhibit B: First Step Pattern Score,* 2. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because Kenney has never demonstrated the ability to comport with society's laws. Instead, he illegally possessed firearms, stole cars, operated a chop shop, escaped from prison and possessed thousands of packets of heroin for sale.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Kenney, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. As of October 22, 2020, this process has already resulted in at least 7,766 inmates being placed on home confinement. *See* BOP Covid-19 Website. At least 116 of those inmates are from the Eastern District of Michigan. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845— the Court should deny Kenney's motion for compassionate release.

## Background

On October 18, 2012, Taylor Police Department officers traffic stopped Kenney and after a positive K9 hit, officers found four Ziploc bags that contained 4,256 individual packets of heroin prepared for sale. The net weight of the heroin was 189.2 grams. *PSR*, 5. On January 15, 2013, Kenney pleaded guilty to one count of possession with the intent to distribute 100 grams or more of heroin, an offense that carried a mandatory minimum 5 year sentence. On May 21, 2013, the Court

sentenced Kenney to the bottom of the guidelines, 92 months incarceration to be followed by 4 years supervised release. ECF No. 24, 72-75. In 2014, Kenney pleaded guilty to receiving and concealing a stolen property [RCSP] – motor vehicle and operating a chop shop in Third Circuit court, Detroit, Michigan. On November 30, 2015, the Court, pursuant guidelines that had been retroactively lowered, reduced his federal sentence to 77 months BOP. ECF No. 31, 86.

   Kenney's lengthy felony criminal history started at the age of 18. From 1983 to present, Kenney repeatedly committed and was convicted of various felony offenses. He would get sentenced to probation and re-offend. He would be paroled from his prison sentences, commit a new felony crime and violate his parole. His only periods of adult life where he was not on probation, parole, arrested or incarcerated was for 14 months between December 1987 and January 1989, and between October 12, 2011 and a state arrest for the chop shop and RCSP-motor vehicle charges in April 2012, and this case on October 18, 2012. His felony convictions are listed in the table below:

| Year | Charge | Discharge | Sentence |
|------|--------|-----------|----------|
| 1983 | Carrying Concealed Weapon | 1984 | 1 yr. probation |
| 1984 | RCSP | 1985 | 2 yr. probation /100 days jail |
| 1985 | Att. RCSP | 1987 | 30 mo. MDOC |
| 1989 | Uttering & Publishing | 2003 | 1-14 yrs. MDOC; multiple parole violations |
| 1990 | Escape from Prison / Hab 4th | 2011 | 6 mo. – 15 yrs. MDOC; parole violations |

| 1992 | Unlawful Driving Away Automobile (UDAA) / Hab 4th | 2011 | 4-20 yrs. MDOC; multiple parole violations |
|------|------|------|------|
| 1998 | UDAA | 2011 | 6 mo. – 20 yrs. MDOC |
| 2004 | RCSP – Motor Vehicle | 2011 | 1-5 yrs. MDOC |
| 2007 | RCSP – Motor Vehicle | 2008 | 2 yrs. probation / 1 yr jail |
| 2008 | RCSP – Motor Vehicle | 2011 | 26 mo. – 20 yrs. MDOC |
| 2013 | PWID 100 grams or more Heroin (instant case) | 2021 | 77 mo. BOP followed by 4 yrs. Supervised Release |
| 2014 | RCSP – Motor Vehicle & Operating a Chop Shop | 2018 | 2-5 yrs. MDOC (date of offense 6 months before instant case but sentenced in state court after). |

*PSR,* 7-14. In addition to his 15 felony convictions, Kenney also used at least seven distinct aliases in his adult lifetime. *Id.*, 2-3.

Kenney began serving his prison sentence on July 17, 2017, and is currently incarcerated at Hazelton FCI. He is 56 years old, and his projected release date is April 6, 2021. His only underlying medical conditions are obesity (BMI 32.7), Gastro-Esophageal Reflux Disease (GERD), Hiatal hernia, elbow pain, shoulder pain and orthopedic issues with his left foot and toes, all of which are medically controlled. *Gov't Sealed Exhibit C: BOP 2020 Medical Records,* 15-18. Nevertheless, Kenney has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Kenny has properly met the exhaustion requirement under the statute.

5

## Argument

I. **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

    A. **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

> **B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now

temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,766 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced

10

ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Kenney's motion for compassionate release.

Kenney's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow.

*United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release

under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for

compassionate release, the district court may not act on the motion unless the

defendant files it "after" either completing the administrative process within the

Bureau of Prisons or waiting 30 days from when the warden at his facility received

his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832

(6th Cir. 2020). And as the Sixth Circuit recently held, this statutory exhaustion

requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary and

compelling reasons" for compassionate release, and release must be "consistent

with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

As with the identical language in § 3582(c)(2), compliance with the policy

statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United

States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir.

2014). To qualify, a defendant must have a medical condition, age-related issue,

family circumstance, or other reason that satisfies the criteria in USSG

§ 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any

other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.   Kenney has satisfied the statutory exhaustion requirement.

Kenney sought a reduction in sentence from BOP on July 21, 2020, and was denied on August 10, 2020. He subsequently requested compassionate release on August 12, 2020 from BOP. He filed his motion to the court on September 14, 2020, waiting the required 30 days to do so. Thus, he has met the statutory requirement of exhaustion.

### B.   Kenney is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Even though Kenney exhausted his administrative remedies, compassionate release is improper. Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence

13

reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive

14

requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Kenney and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Kenney's medical records, however, establish that he is technically obese, with a BMI of 32.7 as of May 22, 2020, which the CDC has confirmed is a risk factor

that places a person at increased risk of severe illness from Covid-19. *Gov't Sealed Exhibit C,* 17; *See also* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with that medical condition, Kenney has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A). Significantly, Kenney has lost significant weight since 2012. When interviewed by US Probation, Kenney was 270 pounds. *PSR,* 17. In May 22, 2020, his weight was down to 241.2. *Gov't Sealed Exhibit C,* 16.

In addition, at Hazelton FCI, Kenney is in a good location with a low number of Covid-19 cases. Hazelton FCI has 1,380 total inmates. Per BOP's website, as of October 22, 2020, only 5 inmates and 1 staff member have confirmed active cases of Covid-19 (last accessed October 23, 2020). The Court has found that similar or worse medical conditions, in facilities with few or no Covid-19 cases justify compassionate release. *United States v. Simmons,* 18-cr-20587, 2020 WL 4529843, at *2 (E.D. Mich. August 6, 2020) ("The fact that defendant is obese and has a history of myocardial infarction does not convince the Court that the risk to his health and safety, at an institution with no known COVID-19 cases, is so unacceptably high that such an extreme remedy is called for."); *United States v. Harvey,* 17-cr-20272-01, 2020 WL 6110859, at *2 (E.D. Mich. October 16, 2020) ("defendant has not shown that the risk of infection at FCI-Morgantown is

unacceptably high. The Bureau of Prisons currently reports that no staff members and just three inmates at that facility, out of a population of 446, are infected.").

But Kenney remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he

17

concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the defendant's presumption of innocence has been displaced by a guilty plea or jury's verdict and when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. It bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect. *See Stone*, 608 F.3d at 948 n.7.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. Drug overdoses are skyrocketing. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Kenney's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Prior to the current Covid-19 epidemic, the United States was, and still is, in the grips of a deadly opioid epidemic. 4,256 individual packets of heroin shows not only a large quantity ready for street sale, but also significant preparation made for sale. The drugs were clearly not for personal use. In fact, Kenney told US Probation in 2012 that he had been sober for five years after completing drug programs in 2007 and 2008. *PSR*, 19. Kenney admitted to Probation, "it was easy for him to find drug distribution as an acceptable source of income." *Id.*

Kenney is also a true recidivist. His felony adult records began at the age of 18 in 1983. Over time, one would hope Kenney had matured and left the life of crime.

He had not. In the ensuing 37 years, there has been less than two years where Kenney was not incarcerated, on probation, parole, and had not been arrested on a new felony crime. Probation recognized that Kenney "has been released to community supervision (probation and parole) several times since 1983 until October 2011, and his adjustments to supervision had always been poor." *Id.*, 25. Kenney is significant danger to the community if released.

Kenney is not eligible for compassionate release.

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020)

20

(upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Kenney eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Kenney's history and characteristics justify denying his motion based on the 3553(a) factors alone. This Court has found danger to the community a disqualifying factor despite medical issues including obesity. *Harvey,* 2020 WL 6110859 at *3. In addition, the factors of deterrence and disparate sentences support denying compassionate release. Kenney argues that because he has served 90% of his sentence, that he should be compassionately released. However, he has been disciplined for destruction of property while in the BOP, despite his assertion in his motion of no disciplinary issues in this incarceration. *Gov't Sealed Exhibit D: BOP Discipline,* 2; ECF No. 36, 5. Kenney's long criminal history, dangerous actions in this case and behavior while incarcerated support that he should serve his full sentence, which was the bottom of the new guidelines after the guidelines had been retroactively reduced. Kenney has been given numerous opportunities throughout his life to better himself. Every time he has returned to crime. His age does not suggest he would do otherwise because he committed the instant offense at the age of 48.

**III.    If the Court were to grant Kenney's motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Kenney's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Kenney's motion should be denied.

Respectfully submitted,

Matthew Schneider
United States Attorney

/s/ Rajesh Prasad
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-0821
Dated: October 23, 2020         Email: rajesh.prasad@usdoj.gov

# Certificate of Service

I hereby certify that on October 23, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

I further certify that I have mailed by U.S. mail, or otherwise provided to a representative with the United States Bureau of Prisons, the paper to the following non-ECF participants:

> Walando Kenney
> Register No. 47752-039
> Hazelton FCI
> 1640 Sky View Drive
> Bruceton Mills, WV 26525

> /s/ Rajesh Prasad
> Assistant United States Attorney
> United States Attorney's Office
> Eastern District of Michigan
> 211 West Fort Street, Suite 2001
> Detroit, MI 48226
> Phone: (313) 226-0821
> Email: rajesh.prasad@usdoj.gov